UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA                :

              vs.                         :       No. 07 Cr. 1170 (LBS)

JOSEPH P. COLLINS,                      :

                    Defendant.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**DEFENDANT JOSEPH COLLINS'S OPPOSITION TO THE GOVERNMENT'S
<u>MOTION TO EXCLUDE EXPERT TESTIMONY</u>**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ....................................................................................................... ii
INTRODUCTION .......................................................................................................................... 1
I.     Expert Testimony To Provide Context About The Customs And Practices In A
Specialized Field Is Admissible ........................................................................................ 5
II.    Contrary To The Government's Mischaracterizations, Bronner's Experience,
Knowledge, Skill and Training are More Than Sufficient to Provide a Sufficient
Foundation for His Testimony Under FRE 702 ................................................................ 7
III.   General Testimony Concerning the Purpose of Meaning of Common
Transactional Clauses is Admissible ................................................................................ 9
IV.   The Government's Motion to Exclude and its Daubert Challenge are Premature .......... 11
CONCLUSION ............................................................................................................................ 14

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Cary Oil Co., Inc. v. MG Refining & Marketing, Inc.*, 2003 WL 1878246 (S.D.N.Y. April 11, 2003) .......... 6

*Cortes-Irizarry v. Corporacion Insular de Seguros*, 111 F.3d 184 (1st Cir. 1997).......... 3, 12

*Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993) .......... 12, 13

*Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173 (S.D.N.Y. 2008).......... 5

*John v. Equine Servs.*, 233 F.3d 382 (6th Cir. 2000).......... 12

*Katt v. City of New York*, 151 F. Supp. 2d 313 (S.D.N.Y. 2001) .......... 13

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .......... 3, 13

*Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505 (2d Cir. 1977) .......... 5, 9, 13

*Media Sport & Arts s.r.l. v. Kinney Shoe Corp.*, No. 95-Civ-3901 (PKL), 1999 WL 946354 (S.D.N.Y. Oct. 19, 1999) .......... 6

*Namoury v. Tibbetts*, No. 3:04-cv-599, 2008 WL 4696066 (D. Conn. Oct. 23, 2008) .......... 6

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991).......... 5, 9

*United States v. Boissoneault*, 926 F.2d 230 (2d Cir. 1991).......... 4

*United States v. Daly*, 842 F.2d 1380 (2d Cir. 1988).......... 4, 6

*United States v. Matera*, 489 F.3d 115 (2d Cir. 2007).......... 4

*United States v. Mulder*, 273 F.3d 91 (2d Cir. 2001).......... 4, 5, 6

*United States v. Nacchio*, 555 F.3d 1234 (10th Cir. 2009).......... 12

**INTRODUCTION**

Although the trial has just begun, we anticipate the government will introduce circumstantial evidence relating to aspects of Joseph Collins's conduct and practice as the senior lawyer at his firm responsible for handling legal work on behalf of Refco. We further anticipate that the government will use this evidence to promote the inference that his conduct was unusual and therefore indicative of crime. We fear that without an understanding of the basic range of custom and practices among transactional lawyers in Collins's position, a lay jury will have no framework of reference by which to evaluate this evidence and might well draw negative inferences where other inferences would be equally or even more justified. A few examples, based on what has already transpired at trial, will help to make this more concrete:

- The government has introduced into evidence copies of Refco's annual financial statements as well as a copy of a Refco private placement memorandum received by Collins, to which a copy of one of Refco's financial statements is attached. Tr. 443 – 46; GXs 3012; 6003-6007. Presumably, the government will use this evidence to argue that Collins was aware of Refco's reported financial condition and was therefore aware of contradictions between the numbers included in Refco's financial statements and the numbers he heard in conversations with some of Refco's principals. *See* Tr. 400 – 03 (Trosten testifies that $350M figure for intercompany debt included in the Proceeds Participation Agreement is greater than the figure disclosed in Refco's financial statement earlier the same year). To rebut this argument, our expert may testify that transactional lawyers do not generally review their client's financial statements, except when asked to do so for a particular purpose, and even then are unlikely to examine and analyze the particular numbers included therein as such matters are generally the province of professional accountants. Further, our expert may testify that just because a relationship partner receives a copy of a private placement memorandum prepared by his client does not mean that the lawyer, in the ordinary course, would have reviewed all of the information in the memorandum, let alone one of its attachments.

- The government introduced settlement agreements prepared by Collins that include a confidentiality provision barring either party from discussing the agreement.  Tr. 335; GX 107.  The jury might infer that such a confidentially provision is evidence of the type of concealment used to hide a crime, whereas our expert may testify that such confidentiality provisions are the norm in similar private settlement agreements.

- The government argued in its opening statement that Collins's guilt can be inferred from the fact that other lawyers at his firm were not always fully aware of some of the particular transactions he was working on.  Tr. 204 – 06.  Our expert may testify that there is nothing unusual about a division of labor and knowledge among large teams assembled to handle large, multifaceted projects, and that, in addition, it is not unusual for lawyers to accommodate client requests about staffing and the need to handle certain sensitive information discreetly.

- The government elicited testimony from witness Robert Trosten that during a brief conversation about a year-end loan transaction, Collins did not inquire about the purpose of the transaction.  Tr. 322 – 23.  Our expert may testify that a lawyer told about a relatively straightforward transaction might not inquire about the client's ultimate business purpose, especially where the lawyer is not being asked to structure or negotiate the transaction and where the client has already provided the lawyer with the basic contours of what appears to be a self-contained transaction.

These examples comprise only a partial list of instances in which we believe that expert testimony could help a jury understand aspects of the practice of transactional law that are beyond its ordinary ken and about which it will be asked to draw inferences in this case.  We strongly urge the Court to refrain from ruling against the admissibility of expert testimony at this early stage, before the government's case has really begun, as the record is insufficient to conclude whether such testimony may or may not be appropriate.  We will be in a much better position to articulate the precise testimony we would seek to offer once we have heard more of the government's case, and we would be prepared to give a full proffer to the Court before seeking to introduce any expert testimony as part of

our defense case. *See, e.g.*, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151-52 (1999) (recommending that expert testimony not be excluded prior to holding appropriate proceedings in which the expert can make a full proffer); *Cortes-Irizarry v. Corporacion Insular de Seguros*, 111 F.3d 184, 188 (1st Cir. 1997) ("[C]ourts will be hard-pressed in all but the most clearcut cases to gauge the reliability of expert proof on a truncated record.").

The government's brief opposing the use of expert testimony misconstrues our purpose. Contrary to the government's characterization, we will not be offering any expert testimony about legal obligations or legal ethics, nor will we be attempting to establish Collins's state of mind through an expert proxy. In addition to the topics already identified above, other topics about which we may seek to introduce expert testimony include, among others, the following:

- customs and practices among transactional attorneys in responding to and accepting client representations that certain categories of documents have been produced in due diligence;

- customs and practices among transactional attorneys in supervising and monitoring the work of associates;

- the general purpose of common and recurring contractual clauses that are employed in many deals and are extremely familiar to all practitioners in the field of transaction law practice.[1]

The government argues that expert testimony on these and other topics should be excluded because it would go beyond the specific practices at Mayer Brown and be too broad to be meaningful with respect to the specific facts at issue in this case. In

---

[1] We may of course supplement our notice as further aspects of the government's case become clear to us.

3

presenting our defense, we will no doubt address the specific facts at issue, including the conduct of lawyers at Mayer Brown.  But, in connection with that effort, we are entitled to provide meaningful context, through the use of expert testimony, so that when the jury examines the specific evidence about what actually transpired, it can assess that evidence with some framework of reference, and not in a vacuum.  The government does precisely that in many criminal cases in which it presents expert testimony to provide background context for specific facts that it intends to elicit – particularly about organizations and practices beyond the experience of the ordinary laymen.  *See, e.g.*, *United States v. Matera*, 489 F.3d 115, 121-22 (2d Cir. 2007) (admitting expert testimony on the composition and structure of organized crime families to help the jury understand how these organizations operate); *United States v. Mulder*, 273 F.3d 91, 101-02 (2d Cir. 2001) (admitting expert testimony on how labor coalitions function to provide background information that helped the jury evaluate the issue of the defendant's intent); *United States v. Boissoneault*, 926 F.2d 230, 232-33 (2d Cir. 1991) (collecting many cases endorsing the use of expert testimony to explain the methods and practices of drug trafficking organizations); *United States v. Daly,* 842 F.2d 1380, 1388-89 (2d Cir. 1988) (admitting background expert testimony on the operation of criminal organization to help "furnish an explanation of the understanding or intent with which certain acts were performed").

    Based on our current understanding of the government's case, we have prepared a revised notice, which we will submit early next week after we have had an opportunity to review it with our expert.  That revised notice, along with this brief, should give a more precise overview of the topics as to which we may seek to present expert testimony.

4

### I.      Expert Testimony To Provide Context About The Customs And Practices In A Specialized Field Is Admissible

The use of an expert to provide meaningful background information – particularly with respect to a specialized area outside the common everyday understanding of jurors – is a traditional and long-accepted use of expert testimony.  *See, e.g., United States v. Mulder*, 273 F.3d 91, 102 (2d Cir. 2001) (affirming use of expert testimony to provide contextual background useful to allow the jury to draw meaningful conclusions concerning the intent of the defendants); *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) ("[T]estimony concerning the ordinary practices in the securities industry may be received to enable the jury to evaluate a defendant's conduct against the standards of accepted practice"); *Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505, 509-10 (2d Cir. 1977) (same).  Such testimony is not only routinely offered by the government (and admitted) in criminal cases involving organized crime, labor corruption, and drugs, as described above, it is also particularly useful in the specific context of cases that involve complex financial or commercial concepts, such as this case.  *Bilzerian*, 926 F.2d at 1294 (admitting expert testimony concerning the requirements of SEC disclosures and ordinary practices in the securities industry in criminal case to "help [the] jury understand unfamiliar terms and concepts" and "enable the jury to evaluate a defendant's conduct against the standards of accepted practice"); *see also Marx & Co.*, 550 F.2d at 509 ("Testimony concerning the ordinary practices of those engaged in the securities business is admissible under the same theory as testimony concerning the ordinary practices of physicians or concerning other trade customs:  to enable the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry."); *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 181 (S.D.N.Y. 2008) (admitting expert testimony concerning customs and practices of brokerage industry as "helpful in allowing the trier of fact to better understand the evidence");

5

*Cary Oil Co., Inc. v. MG Refining & Marketing, Inc.*, 2003 WL 1878246, at *4 (S.D.N.Y. April 11, 2003) (admitting expert testimony on the regulation of derivative contracts by the CFTC in civil case concerning sales of securities to help the jury understand the "complex issues inherent in the formation" of the contracts at issue in the case).  District courts within the Circuit have applied the same reasoning to admit  "testimony concerning the ordinary practices of lawyers and others engaged in a particular business … to enable the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry." *Media Sport & Arts s.r.l. v. Kinney Shoe Corp.*, No. 95-Civ-3901 (PKL), 1999 WL 946354, at *1 (S.D.N.Y. Oct. 19, 1999); *see also Namoury v. Tibbetts*, No. 3:04-cv-599, 2008 WL 4696066, at * 5 (D. Conn. Oct. 23, 2008) (admitting expert testimony on the practice of real estate law in negligence case).

Background testimony concerning lawyer customs and practices can also include testimony concerning such customs and practices as they relate to the relationship and interaction between lawyer and client.  As is true generally of background testimony concerning professional practice, such testimony can provide important background and context to the jury about an area that is unfamiliar to them.  *See, e.g.*, *Daly*, 842 F.2d at 1388 (expert testimony admitted for the purpose of "provid[ing] background for the events alleged in the indictment"); *Mulder*, 273 F.3d at 102 (affirming use of expert testimony to provide contextual background). The relationship and interaction between lawyer and client is unlike many other kinds of professional interactions (such as between auditor and client or investment banker and client), and is likely to be unfamiliar to most jurors.  Even if jurors have themselves retained lawyers in the past to prepare wills or handle similar simple matters, this experience may give them misleading impressions about how lawyers and clients relate to each other in the very different context of complex corporate transactions.

6

There need be no concern that admission of testimony concerning the lawyer-client relationship will risk invading the province of the Court. The defense does not intend to have Mr. Bronner provide any opinions about the law or doctrine of legal ethics or any applicable codes of professional responsibility. Nor is it the intent of the defense to offer any statement through Mr. Bronner of the normative obligations of lawyers concerning their interaction with clients. He will not offer any opinion on the legal consequences to a lawyer of effectuating client decisions, and the court's exclusive province to instruct the jury on such matters will not be impacted in any way. Rather, Mr. Bronner's opinions will be limited to statements concerning the usual practices and customs actually used by lawyers in interacting with their corporate clients in a transactional setting.

II.     **Contrary To The Government's Mischaracterizations, Bronner's Experience, Knowledge, Skill and Training are More Than Sufficient to Provide a Sufficient Foundation for His Testimony Under FRE 702.**

Mr. Bronner has worked as a transactional lawyer at three law firms over the course of thirty-five years, including two of the largest and most respected Chicago-based corporate law firms aside from Mayer Brown itself. He served as Co-Chair of the corporate department at Jenner & Block and as a member of the executive committee of the corporate department at Katten Muchin Rosenman. At the Jenner firm, he had direct responsibility for overseeing the entire corporate department, including the management of attorney teams and client relationships for the firm's work on numerous mergers, acquisitions, securities offerings, and private equity deals. Presently, he is a senior partner specializing in mergers and acquisitions at the boutique Chicago law firm Ungaretti & Harris, where he has advised on dozens of transactions in the past four years. In the course of his work at these firms, Mr. Bronner represented clients in many transactions in which attorneys from many different firms (including Mayer Brown) represented

7

other parties in the deal, and has had an opportunity to observe their work and their practices in great detail.

Moreover, Mr. Bronner not only served as the Vice-Chair of the American Bar Association's ("ABA") Committee on Negotiated Transactions for the Business Law Section, he was also the Co-Chair of the Business Law Section's Sub-Committee that drafted the ABA *Model Stock Purchase Agreement with Commentary—the* standard template for the very kind of corporate transaction principally at issue in this case.  That work was the product of an intense nine-year effort in which Mr. Bronner collaborated with over a dozen leading transactional M&A practitioners across the country, and was able to learn in great detail the commonalities that exist nationwide with respect to the customs and practices of transactional law practice.  For the government to characterize this obviously pertinent work as "work on some bar committees [which do not] relate to the general practice of corporate law" beggars belief.  (Gov't. Br. at 17)  Put simply, it is impossible to think of a set of qualifications or experience that would be more appropriate for an expert in this case.

The government's attempt to dispute Mr. Bronner's qualifications and reliability are unsubstantiated.  For example, the government assumes that large corporate law firms based out of Chicago staff their transactions in completely different ways.  Of course, given that a transaction always involves multiple parties, Mr. Bronner would have had occasion over the years to observe in considerable detail the manner in which peer firms staff transactions.  These are matters properly addressed through the voir dire process and cross-examination, not in a pretrial motion in limine filed in response to a Rule 16 summary notice.

The government's complaint that Mr. Bronner's proposed testimony may contain general principles or nuanced statements to the effect that certain practices vary on the basis of different

circumstances is misplaced.  There is no reason an expert cannot testify as to general principles – indeed such testimony is favored by the Second Circuit.  *See, e.g., Bilzerian*, 926 F.2d at 1294 ("[T]estimony concerning the ordinary practices in the securities industry may be received to enable the jury to evaluate a defendant's conduct against the standards of accepted practice"); *Marx & Co.*, 550 F.2d at 509-10 (noting that "testimony concerning the ordinary practices of those engaged in the securities business is admissible . . . to enable the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry.").

There is also no reason (and the government does not identify one) why an expert cannot testify that certain industry practices may vary according to circumstances.  Such testimony may be very pertinent to the extent the government may attempt to argue that lawyers can be assumed to operate in only one fashion regardless of circumstances.  Once again, the government's argument, while potentially going to the weight of Mr. Bronner's testimony, is wholly inappropriate as a basis to exclude his testimony wholesale on a motion in limine.  And once again, the government's argument is at odds with the government's own common practice of offering background expert testimony concerning practices in organized crime or money laundering schemes, which presumably do not all operate identically and whose practices may vary over time and based on surrounding circumstances.

### III. General Testimony Concerning the Purpose of Meaning of Common Transactional Clauses is Admissible

The government intends to introduce "lay opinion" testimony in order to show how the lawyers who represented Thomas Lee understood and interpreted certain provisions of the stock purchase agreement between Lee and Refco, even apart from conversations they had with Collins.  The government has explicitly stated that it intends to use this "lay opinion" testimony

9

not simply to explain the beliefs of the witnesses, but to draw inferences concerning the state of mind of the defendant himself.  Gov't Letter dated May 8, 2009, at 2.

The government's intended use of its lay opinion witnesses presents the defense with a Hobson's choice:  if the defendant elects not to testify, there will be no response to the views of the government witnesses, and the jury is likely to draw the unwarranted inference that the explanations of the government witnesses represent both the true meaning of the contract and the defendant's own understanding of that meaning.  If, on the other hand, Mr. Collins were to testify to his own different understanding of the agreement, the jury will be placed in the difficult position of having to evaluate the reasonableness of his view without any background or contextual understanding concerning the general nature and purpose of clauses in corporate agreements.

The proffered testimony of Mr. Bronner responds to both of these serious concerns.  Mr. Bronner is prepared to testify concerning the general purpose of having representations and warranties in a stock purchase agreement and, where appropriate, concerning the basic purpose and function of certain common and standard contractual clauses at issue.  Such testimony is essential for the jury to understand the basic context in which the understandings of the parties to the agreement arise.  He is also prepared to testify that it is common for transactional lawyers to disagree or take different positions about the meaning of contractual clauses, testimony which is essential to the ability of the defense to rebut what would otherwise be the improper inference that such disagreement could only arise if one side were acting illegally or unreasonably.

The government apparently misread the defendant's Rule 16 Notice as providing that Mr. Bronner will testify specifically about the meaning of the individual agreements at issue in the case.  However, that is neither what the disclosure provides, nor is it the defense's intention to

10

have Mr. Bronner testify concerning these specific agreements, except to the extent they contain certain standard clauses known to all practitioners in the field and then only for the purpose of explaining the generally understood purpose and meaning of such standard clauses. Rather the intent of the defense is to do exactly what the notice specifies – to limit Mr. Bronner's testimony to opinions concerning the meaning and interpretation of standard clauses found in corporate agreements generally. Although some of these clauses may happen to be found in the EPMA or the PPA, Mr. Bronner's testimony will not opine on what the parties to those agreements themselves intended or understood about those clauses. Rather, the testimony will simply provide the jury with useful background concerning the standard role and function of these clauses, to provide meaningful context to the testimony of the fact (and "lay opinion") witnesses in the case.

The government's entire argument on this point accordingly is irrelevant. Mr. Bronner's knowledge (or lack thereof) of the PPA and EPMA is not at issue because he will not be providing affirmative testimony on these agreements or what the parties intended or understood about them. For the same reasons, the cases cited by the government concerning testimony about ultimate legal conclusions based on the facts of the case is wholly inapplicable, because they concern cases where the expert purported to give interpretations of the legal effects of the specific contracts at issue in the case. That is not what Mr. Bronner will be doing here.

**IV.     The Government's Motion to Exclude and its Daubert Challenge are Premature**

There is no valid basis for preemptively excluding the proffered expert testimony at this early stage of the case. The potential helpfulness of the proposed expert testimony can only be determined with reference to the proof the government actually presents at trial. Because the expert testimony will not be offered until after the government's case has been presented in full,

11

there is no need to make a ruling before the nature of the government's proof is made clear. Only after the government's case has been presented will the record be sufficient for the Court to evaluate the admissibility of to what extent the proffered expert testimony may prove useful.

Although the government suggests that the Court exercise its "gatekeeping function" under *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993), the basic pre-requisites for the exercise of that function do not yet exist. The Supreme Court has held that although federal courts may dispense with undertaking a formal hearing where the reliability of expert testimony is clear, "appropriate proceedings" are ordinarily required where reliability is challenged. *Kumho Tire Co.*, 526 U.S. at 151-52. No such proceedings have been held here. To date, the defense has merely provided a Rule 16 notice, which only requires a written "summary" of proffered opinions and qualifications. The witness has not yet been afforded an opportunity to provide testimony or affidavits concerning his qualifications and methodology. No *Daubert* hearing has been held or scheduled to examine the government's challenge, nor has the government even bothered to request one. At this stage – with the bare Rule 16 notice the only information in the record – it is premature to request outright exclusion of expert testimony on *Daubert* grounds. *See, e.g., Cortes-Irizarry*, 111 F.3d at 188 (" [G]iven the complex factual inquiry required by Daubert, courts will be hard-pressed in all but the most clearcut cases to gauge the reliability of expert proof on a truncated record."); *John v. Equine Servs.*, 233 F.3d 382, 393 (6th Cir. 2000) (reversing exclusion of expert testimony in the absence of a proper *Daubert* hearing, noting "a district court should not make a *Daubert* determination when the record is not adequate to the task"). *But see United States v. Nacchio*, 555 F.3d 1234 (10th Cir. 2009) (excluding expert testimony following Rule 16 notice), *petition for cert. filed*, 77 U.S.L.W. 3559 (U.S. Mar. 20, 2009) (No. 08-1172).

If the Court deems a *Daubert* review to be required, Mr. Bronner and the defense are ready, willing, and able to make ample showings concerning his qualifications and the reliability of his testimony. However, such a review is not required in this case, because the government concedes in its brief that experience – standing alone – can be a sufficient basis for establishing the requirement of reliability under Rule 702. Motion at 16. As the Supreme Court explained in *Kumho Tire*, even after *Daubert*, "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." 526 U.S. at 156. See also Rule 702, Advisory Notes to the 2000 Amendments ("[n]othing in this amendment is intended to suggest that experience alone – or experience in conjunction with other knowledge, skill, training or education – may not provide a sufficient foundation for expert testimony."); *Marx & Co.*, 550 F.2d at 508-09 (permitting expert testimony by attorney as to standards and ordinary practices in the preparation of registration statements based on the attorney's past experience in preparing and filing such statements); *Katt v. City of New York*, 151 F. Supp. 2d 313, 356-57 (S.D.N.Y. 2001) ("[T]hat an expert's opinion is not based on statistical studies does not render that opinion inadmissible"). Indeed, the government itself routinely proffers expert witness testimony concerning customary practices in specialized fields where the reliability of the testimony is based solely on the witnesses' experience in their field.

In the context of this case, the reliability requirement is plainly satisfied. Mr. Bronner's experience and methods are more than appropriate to the task – he has worked on hundreds of commercial transactions similar to those at issue in the case and he has had the opportunity to work closely with hundreds of other transactional practitioners across the country and carefully observe their practices and methods of operation. In his committee work and role in drafting the American Bar Association's *Model Stock Purchase Agreement with Commentary*, he surveyed

13

academic and practice literature on commercial practice, and had extensive discussions concerning the methods of transactional practice and the use and employment of common contractual clauses with dozens of other leading attorneys in the field.  These are precisely the kind of methodologies that professional lawyers employ to learn about and understand the practice of law in their respective fields, and they are just as reliable if not more so than the methods employed by government agents to learn about (and give expert testimony concerning) the operation of criminal enterprises.

## CONCLUSION

For the foregoing reasons, we respectfully urge the Court to deny the government's motion and to permit the defense to introduce appropriate expert testimony.

Dated: May 15, 2009                                          Respectfully submitted,

/s/ William J. Schwartz
William J. Schwartz (WJS 8462)
Jonathan P. Bach (JB 9710)
COOLEY GODWARD KRONISH LLP
1114 Avenue of the Americas
New York, New York  10036
Telephone:  (212) 479-6000
Facsimile:  (212) 479-6275

**CERTIFICATE OF SERVICE**

I, William J. Schwartz, hereby certify that on this 15th day of May, 2009, I caused a true and correct copy of Defendant's Opposition to the Government's Motion to Exclude Expert Testimony on behalf of Joseph P. Collins to be filed electronically. Notice of this filing will be electronically mailed to all parties registered with the Court's electronic filing system.

    /s/ William J. Schwartz

William J. Schwartz (WS 8462)